**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00147-002 (CKK)** |
| **v.** | : | |
| | : | |
| **VIRGINIA MARIE SPENCER,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Virginia Marie "Jenny" Spencer to three months of incarceration, 36 months of probation, and $500 in restitution.

**I.     Introduction**

The defendant, Virginia Marie "Jenny" Spencer and her co-defendant and husband, Christopher Raphael Spencer,[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Jenny Spencer pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating or Picketing in the Capitol Building. As explained herein, a period of incarceration

---

[1] Also charged in *United States v. Spencer*, 21-cr-147-1, with Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512 and 2, and the same four misdemeanor charges the defendant faced.

1

is appropriate in this case because (1) the defendant joined in a group that got into a verbal and physical altercation with a man on the way to the riot only stopping after the MPD officers physically separated them; (2) the defendant brought her 14-year-old child into the Capitol during the riot; (3) she entered the Capitol at approximately 2:19 p.m. through the Senate Wing Door, close in time to when other rioters broke open this door and shattered the nearby windows in the initial breach of the Capitol at approximately 2:13 p.m.; (4) she joined the crowd that surged past police officers trying to hold back the rioters in the Crypt; (5) she went into the suite of offices assigned to Speaker of the House Nancy Pelosi; (6) she joined another crowd that formed outside the House of Representatives Chamber that attempted to enter that Chamber while lawmakers were still trapped inside; (7) she witnessed violence against law enforcement officers yet continued to participate in the riot; (8) she minimized her conduct to the FBI when interviewed; and (9) the instant case is not her first involvement in the criminal justice system.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). As described above, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant involving her minor child renders a sentence of incarceration both necessary and appropriate in this case.

## II.        Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 37 (Statement of Offense), at 1-4. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. The sheer number of people who chose to be a part of this attack on democracy overwhelmed the Capitol despite attempts by law enforcement to fight them off. Even those who did not attack others, destroy property, or threaten members of congress themselves supported those who did by joining them. The presence and participation of each and every one of these people encouraged and enabled other rioters as they breached the grounds and the building.





With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Jenny Spencer's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Jenny Spencer, her husband, Christopher Spencer, and one of the couple's minor children, then 14 years old, traveled to Washington, D.C. from their home in North Carolina to attend the "Stop the Steal" rally. The defendant wore a distinct sweatshirt with "Fuck Gun Control" written on the back with the "F" and "K" formed by firearm silhouettes.  The couple originally intended to travel as part of a caravan organized by an internet personality, but ultimately ended up driving separately.

Once in Washington, D.C., they attended the rally whereat then-President Trump advised the group was going to march to the Capitol.  As the Spencers walked down Pennsylvania Avenue toward the Capitol, they fell in behind a group of individuals in tactical gear that the defendant felt were a militia group, who were chanting "Fuck Antifa!"[2] During the march to the Capitol, the

_____

[2] Open-source video from January 6 depicts this group and their chant and they can be identified as the Proud Boys.  The Proud Boys is a nationalist organization with multiple U.S. chapters and

Spencers joined a smaller group who broke away and aggressively confronted a "counter-protestor" who had expressed disagreement with marchers.  Specifically, the Spencers, with their child next to them, and others yelled at the lone counter-protestor.  Mr. Spencer yelled, "Easy to talk shit behind the cops!"  The defendant yelled, "Look who's protecting you…(indiscernible) behind the fuckin' police!"  D.C. Metro Police physically broke up the encounter which was captured on body-worn camera.

Upon approaching the Capitol building, the defendant observed barriers before the steps to the Capitol and saw law enforcement shooting tear gas and using percussion grenades on the crowd to push them back.  She saw people climbing scaffolding and saw police arrest at least one individual.  Undeterred by these observations, she and her husband pressed forward with their child in tow. The Spencers climbed the northwest stairs near the inauguration stage, bringing them to the northwest courtyard at approximately 2:17 p.m.  The Spencers entered the Capitol building through the Senate Wing Door at approximately 2:19 p.m., about six minutes after the initial breach of the building.

---

potential activity in other Western countries.  The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists."  Proud Boys members routinely attend rallies, protests and other First Amendment-protected events, where certain members sometimes engage in acts of violence against individuals whom they perceive as threats to their values.  The group has an initiation process for new members, which includes the taking of an "oath."  Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems.  Multiple members of the Proud Boys have been arrested for their participation in the January 6 riot at the Capitol.



They lingered briefly in the northwest corridor and then turned right, proceeding into the Crypt. There, U.S. Capitol Police had formed a line of officers blocking the rioters from advancing further into the building. As the police tried to hold the crowd back, the defendant took a selfie, Mr. Spencer livestreamed on Facebook, and the defendant appeared to take a phone call.





But rioters continued streaming into the Crypt, quickly outnumbering the officers, and pushing past them.  Though not at the front, the Spencers formed part of this critical mass and moved past the police into the Small House Rotunda.



The Spencers took the stairwell south of the Crypt to the second floor of the Capitol and briefly entered the Speaker's office suite before turning around.



This was captured on a Facebook Live video that Christopher Spencer filmed at the time. Of note, Speaker Pelosi had staff members who were trapped inside that suite as the rioters called for Speaker Pelosi steps away from them.



The Spencers left Speaker Pelosi's office suite and proceeded across Statuary Hall.



In the Statuary Hall Connector, the Spencers joined yet another group of rioters outside the House Chamber as they attempted to gain access to the House Chamber where members of Congress were sheltering.  Although Jenny Spencer was not at the front of this group and not vocal, for approximately nine minutes, she was part of this particular mob, who were chanting "Stop the steal!" and "Break it down!" in reference to the House Chamber door.  Here, the defendant smoked a cigarette inside the Capitol, as well.



In a video filmed by Christopher Spencer, the defendant appeared to speak with a Capitol Police Officer to the left and down the hall from the Statuary Hall Connector.  The substance of the conversation is not captured on the recording, but the defendant recounted the conversation for her husband on the video.  The defendant says she told the police officer, "This is not only for us; this is for y'all too."  To which the defendant states the officer replied, "I know, but the point's been made…the point's been made."  The defendant recounts that she replied, "Well, it's bullshit."

After tear gas is deployed near the House Chamber entrance, the Spencers moved past a stairwell and into a hallway to the east of the House Chamber where they again lingered while

alarms blared despite being steps away from the exit.  As they lingered there, a group of officers attempted to move down the hallway but were attacked by a rioter.  Mr. Spencer then joined that group confronting the officers and filmed as he yelled to police, "Smile motherfucker!  Smile bitch!" while other rioters slid furniture at the officers. The defendant moved toward the door then turned around and went back into the hallway.  This despite the Spencers having a clear view of the exit.  Approximately three minutes after she is first in the small hallway near the exit and after the officers have gotten past the rioters, the Spencers finally exited onto the balcony where they lingered some more.

In total, the Spencers spent just over 30 minutes inside of the Capitol, during which time the defendant took several photographs. The defendant has admitted that she knew at the time she entered the U.S. Capitol Building that she did not have permission to do so, and she engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.  She did all of this with her minor child in tow.

*FBI Interviews*

Two weeks after the attack on the Capitol, the FBI interviewed the defendant.  During the voluntary interview, she sought to minimize her involvement in the riot with statements that are contradicted by video evidence.  Specifically, the defendant stated she and her family could not turn around because the crowd was pushing them into the building, but this is refuted by their voluntary stroll to the Senate Wing Door, as depicted below:



The defendant stated that upon entering the building, the family told each other something to the effect of, "We gotta get out of here."  This is contradicted by their stay inside the Capitol of more than 30 minutes, their statements inside and their participation in multiple groups of rioters who broke through the police line and attempted to breach the House Chamber Door.  In a second interview with the FBI on May 18, 2021, the defendant provided the FBI with several photos she took inside and outside the Capitol despite previously telling the FBI she did not take any photos or videos, which was again contradicted by the video evidence.  These photos depict other rioters, and none are included in this filing.



*The Charges and Plea Agreement*

On February 5, 2021, Jenny Spencer was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On February 8, 2021, she was arrested at her home in North Carolina.  On March 10, 2021, a grand jury returned an indictment charging the defendant in four counts.  On September 9, 2021, she pleaded guilty to Count Five of the Indictment, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading,

Demonstrating or Picketing in the Capitol Building. By plea agreement, Jenny Spencer agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment, up to five years of probation and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561(a)(3) thus states the general rule that "imposition of both probation and straight imprisonment" in the same sentencing hearing is not permitted. *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992).

The general prohibition against sentences that combine continuous incarceration and probation does not apply, however, where the defendant is sentenced for a petty offense. *See* 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Posley*, 351 F. App'x at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3651(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus

probation." *Id.* at 809.[3] Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.[4] The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

For the reasons described below, a sentence of three months in custody, 36 months of probation, and $500 in restitution is appropriate in the defendant's case.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the

---

[3] The district court in *Posley* had concluded the six-month prison term was permissible as a discretionary condition of probation under 18 U.S.C. § 3563(b)(22), which permits the sentencing court to require the defendant to "satisfy such other conditions as the court may impose." *See Posley*, 351 F. App'x at 808. Because the Fourth Circuit concluded that the sentence was permitted under Section 3561(a)(3), it did not decide whether the district court's reliance on Section 3563(b)(22) was erroneous.

[4] A sentencing court in a non-petty offense case may combine incarceration and probation only where incarceration is made a condition of probation and imposed through "intermittent confinement." *Anderson*, 787 F. Supp. at 539; *see* 18 U.S.C. § 3563(b)(10) (permitting sentencing court to require the defendant as a condition of probation to "remain in custody of the Bureau of Prisons during nights, weekends, or other intervals of time").

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a period of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction; (4) the

defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

The Spencers, and their minor child, entered the Capitol through the Senate Wing Door approximately five minutes after the initial breach, which left in its wake shards of glass on the ground from the clearly visible broken windows and a high-pitch beeping, similar to a fire alarm. The defendant's attempts to minimize her conduct to the FBI are refuted by video evidence and her own actions.  She was not forced into the Capitol by a crowd; she voluntarily entered after proceeding past barricades, through tear gas and percussion grenades, and after witnessing at least one arrest. Inside, she was a part of three mobs, one in the Crypt that overwhelmed police to gain further access to the building, one that invaded Speaker Pelosi's office suite, and one that demanded entry to the House Chamber.  After seeing each group, she chose to join them and continue to participate in the Capitol assault rather than to leave.  She told a police officer she was "doing this" for him, too.  And she did all of that with her minor child in tow.

Accordingly, the nature and the circumstances of this offense reflect a need for a lengthy period of incarceration.

18

## B.  The History and Characteristics of the Defendant

The instant case does not represent Jenny Spencer's first involvement in the criminal justice system.  As set forth in the PSR, the defendant's criminal history consists of a misdemeanor conviction for Driving with a Revoked License, though she was originally charged with Possession of Stolen Goods/Property, Simple Possession of Scheduled IV Drugs and Possession of Drug Paraphernalia, which were dismissed with the plea, for which she was sentenced to 20 days in jail and 18 months of probation. ECF 48 ¶ 25. She also served a day in jail in 2011 for a traffic infraction. ECF 48 ¶ 24. The defendant has struggled with narcotics addiction in the past but has been compliant with her treatment program while on pre-trial release and has provided negative drug tests.  She has been compliant with her other conditions of pre-trial release, as well.  A period of supervision—a term of probation—will assist in her recovery.  The defendant is a stay-at-home mother to her five children.

## C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The defendant's own words ("this is not only for us, this is for y'all, too") evince that by attacking the Capitol, she felt she was embarking on a noble endeavor as a representative of the citizenry. She could not have been more wrong. The government acknowledges that the defendant accepted responsibility early by entering into this plea agreement. On the other hand, her actions on Janaury 6, 2021, specifically, being adjacent to violent activity, bringing her minor child along, and minimizing her role, left a stain on this nation's history and underscores the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[6]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[7] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, the government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged

---

[6] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[7] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Five of the Superseding Indictment, charging her with Parading, Demonstrating or Picketing in the Capitol, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of her participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police, prompt acceptance of responsibility, and expressions of genuine remorse.

While no previously sentenced case contains the specific blend of aggravating and mitigating circumstances present here, the Court may also consider the sentence of 60 days incarceration imposed by this Court on Boyd Camper for reference.  Camper also brought along his minor child to the Capitol on January 6, though he left the child outside with a friend before storming the building.  *See* 21-cr-325-05-CKK, Dkt. No. 325.  The case at bar is analogous to the Erik Rau and Derek Jancart cases where Rau and Jancart also entered the Capitol approximately 5 minutes after the initial breach, formed part of the critical mass in the Crypt to surge past police, entered Speaker Pelosi's office suite, and spent approximately 40 minutes in the Capitol.  *See* 21-cr-467-JEB, Dkt. No. 13 and 21-cr-148-JEB, Dkt. No. 25.  Both Rau and Jancart were sentenced to 45 days incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Jenny Spencer to three months incarceration, 36 months of probation and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Douglas G. Collyer*
DOUGLAS G. COLLYER
NDNY Bar No. 519096
Assistant United States Attorney
U.S. Attorney's Office
14 Durkee Street, Suite 340
Plattsburgh, New York 12901
Office: 518-314-7800
Douglas.Collyer@usdoj.gov