## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Case No. 21-0147-02 (CKK)** |
| | : | |
| **VIRGINIA MARIE SPENCER,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>REDACTED DEFENDANT'S SENTENCING MEMORANDUM</u>

The defendant, Mrs. Virginia Marie Spencer, through her attorney, Allen H. Orenberg, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), submits this (redacted) memorandum to aid the Court at sentencing and hereby notifies the Court that she has received and reviewed the Presentence Report ("PSR") prepared in this case. After carefully reviewing the PSR with Mrs. Spencer, there are no objections. Mrs. Spencer requests that this Honorable Court impose, essentially, a sentence of a term of 12 months probation with community service to account for:

1.  Her lack of preparation or planning prior to January 6, 2021 to be part of the U.S. Capitol breach event, and her peaceful, non-destructive and non-violent behavior that day both outside and inside the U.S. Capitol building.

2.  Her immediate cooperation with law enforcement officers when arrested, as well as her ongoing cooperation and willingness to resolve her case at the earliest opportunity.

Mrs. Spencer comes before the Court having plead guilty on October 4, 2021, to Count Five of the Superseding Indictment, charging her with a violation of Title 40 U.S.C. §5104(e)(2)(g) – Parading, Demonstrating, or Picketing in a Capitol Building. A sentence of 12 months of probation, with community service, is a reasonable sentence that is "sufficient, but not greater than necessary" to address the sentencing factors and goals set forth in Title 18 U.S.C. § 3553(a). Under the facts of this case, such a sentence will protect the public, provide just punishment, and afford adequate deterrence.

1. **BACKGROUND**

A. **Mrs. Spencer Watches Media Coverage of The Black Lives Matter Protests of 2020 and Trump Denouncing the 2020 Election.**

The summer of 2020 was a violent one for major cities across the United States, in large part, due to the protests of Black Lives Matter (hereinafter "BLM"). After several months of being couped up because of Covid-19, people took to the streets to protest the horrendous murder of George Floyd. Unfortunately, especially in D.C., these protests turned violent. These protests were widely televised on the nightly news and other media outlets as a necessary process for vocal opposition to systemic racism and the only way racial justice could be effectuated. Mrs. Spencer watched from her home in North Carolina and on the internet as hundreds of businesses were destroyed over a period of weeks, several people were injured, and nearly two billion dollars of damage was done by rioters nationwide.

2

After the presidential election, former President Donald Trump (hereinafter "Trump") and his inner circle began spreading the word that the election was "stolen" from him by Democrats and others. False claims were made on media sources, as well as by the former President himself, that the election system had been corrupted and that the integrity of the election should be questioned. The Court can only understand why Mrs. Spencer came from North Carolina to D.C. when taking into account these two pivotal events in our nation's history. While consumption of media news is no excuse for behavior, it does demonstrate the powerful impact news stories, fake or real, have on the citizens of their country. The media sets the tenor for how people feel about their rights and freedoms and can also plant notions of discontent or even outrage. After months of watching our major cities burn, many people became convinced that vocal displays of outrage in the form of protesting was the only way to make their voices heard. Additionally, because very few people were being prosecuted for their criminal behavior while violently protesting, which was replayed over and over again on the nightly news, the media helped reinforce the notion that there would be little to no consequences for protestor actions. Here, in D.C., although hundreds, if not thousands, committed property crimes such as painting federal statues and burning and breaking into private businesses in town, the number of prosecutions was negligible. Tucker Carlson and other conservative TV show hosts noted ther on their nightly news casts. *https://www.foxnews.com/opinion/tucker-carlson-the-riots-are-not-about-george-floyd-or-racial-justice-theyre-about-trump-and-seizing-power*.

Mrs. Spencer, like millions of other Americans, ate up the media coverage of these events in the Summer of 2020. She saw the media label destructive and violent riots as "mostly peaceful" protests and the protestors praised on national media outlets for their strongly held beliefs. And while the majority of BLM protests in the summer of 2020 were, in fact, peaceful, a report studying these protests found a large number of Americans believed they were not. The report suggested that the "disparity stems from political orientation and biased media framing... such as disproportionate coverage of violent demonstrations." https://time.com/5886348/report-peaceful-protests/.

Mrs. Spencer similarly had strongly held beliefs after the Presidential election that there had been irregularities in the election that were not proper. She was also emboldened by a new understanding of how vocal and peaceful protests were being conducted in our country to garner attention for important issues effecting the future of our nation. She decided to come to D.C. to *peacefully* protest the results of the election and the lack of attention to alleged voting irregularities (emphasis added). She did so with no intent to do anything but add her voice to the vocal protests over the injustice she perceived had happened in the election. She did not suit up for combat. She did not obscure her face. She was not armed and she committed no violent actions in her peaceful protest. Mrs. Spencer did not destroy anything. Mrs. Spencer's only desire was to participate in a democratic process that is protected under the 1st Amendment of our Constitution. Unfortunately, going into the Capitol was not part of that democratic process and she now stands before the

4

Court after admitting to the Court at her plea hearing that she knew going into the Capitol that day was wrong.

### 1.    THE TRIP TO THE CAPITOL AND JANUARY 6, 2021

### A.    Mrs. Spencer's Trip to D.C. and Her Walk to the U.S. Capitol

Mrs. Spencer believed what she read on the internet and heard from the President himself - that the election had been stolen. She believed that there was wrongdoing in the State of Georgia, and in other States, with regard to the counting of the Presidential election votes. She also believed that she should show her support for the soon to be former President by attending the rally and other rallies scheduled for January 6, 2021, at the Ellipse on the Mall. She had never attended any other political rallies or gatherings. Importantly, Mrs. Spencer was fixated on the *process,* not the result of the election. The emphasis on the process, and not the result, is particularly important because it shows that Mrs. Spencer values the Constitution and the foundation of our government.

Mrs. Spencer had always wanted to come to Washington, D.C., and this seemed to be the perfect opportunity. At the time, she was unemployed and a stay-at-home mother (5 children – one of her children is disabled as being legally blind), like hundreds of thousands of other Americans during the pandemic. Her husband (and co-defendant) Christopher R. Spencer asked her to accompany him and their teen-age son to go to Washington, D.C. and she accepted his invitation. At no time did she ever think she was going to the U.S. Capitol grounds, let alone inside the Capitol building. Not until Trump's speech did she have any intention of going

anywhere other than the Ellipse area, and not being from the area or having attended a protest there before, she had no real sense of where things were in relation to each other. As the day unfolded, she never planned or envisioned entering the U.S. Capitol building. That is, not until Trump invited everyone to march to the U.S. Capitol. Mrs. Spencer and her husband followed the large crowd there that day with no intention of doing anything but having her voice join those of thousands of other peaceful protestors. Now, after seeing what really happened that day by watching film on numerous platforms, Mrs. Spencer is ashamed of the fact that she was a part of it, albeit a small part of it compared to the many violent protesters who assaulted police officers and caused damage to the U.S. Capitol building.

### B. Mrs. Spencer's Activities Inside and Outside the U.S. Capitol

For some time, police were able to fend off the crowd, but as we now know, the crowd overwhelmed the few, unprepared police.[1] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol building was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. The breach spurred the evacuation of members of Congress and the Vice President. More than 30 minutes later, the

---

[1] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

Senate Wing Doors were penetrated by the crowd, pushing U.S. Capitol Police officers back into the inside corridor as they tried to prevent further intrusion.

Mrs. Spencer was not in the first wave of hundreds of protesters. In fact, the available video footage shows that she was at least hundreds of people back behind the original breach. She could not see what was transpiring inside the Capitol building. She had no idea of the violence in other parts of the Capitol. In fact, Mrs. Spencer had been so far behind the first people in that she had no idea how the door was opened or who opened it. She was, in her words, "following like a lemming" and following others ahead of her. The confusion at this point lies between conflating *our epistemic access* of the full scope of events in their entirety with *Mrs. Spencer's knowledge and intention* as the day unfolded. That is, though many others were violent, pushing officers, etc., Mrs. Spencer was not violent, carefully observed the situation around her, and acted with decency (as we will see later).

As they entered the Senate wing door, people around Mrs. Spencer began to celebrate. The mood was not unlike other protests in Washington, D.C., and many persons around took selfies and appeared peaceful with cameras and flags. She felt like she was on a tour of the U.S. Capitol and recalls that she was in a room with large columns and statues. While following the crowd aimlessly through the halls in the U.S. Capitol, her husband was taking photos/videos with his cell-phone. While inside, Mrs. Spencer she did observe others attacking police officers in the Crypt area but she did not participate in this conduct. She also walked in the Statutory Hall area and along the hallway which lead to Speaker Pelosi's Office. Mrs. Spencer and her husband made a decision to exit the U.S. Capitol on the east side of the

building, which occurred at approximately 2:40 p.m. She estimates they were inside the building for approximately 20 minutes.

Once outside the Capitol building, she and her husband and son promptly left the area and began the drive back to their home in North Carolina. As stated in the statement of offense, there is no evidence she was violent or destructive on the grounds or inside the Capitol. *See* Statement of Facts. (Doc. 37)

### C.    Hindsight is 20/20.

Now, in retrospect, Mrs. Spencer wishes she'd never come to Washington, D.C. at all, which is terribly sad because our Nation's Capital is incredible in so many ways. She never imagined going inside the U.S. Capitol building and certainly never thought that violence would follow. She was not part of a group that either organized activities on January 6th or does she subscribe to any far-right political views. Importantly, Mrs. Spencer did not have any intention of stopping the vote. Indeed, Mrs. Spencer's aimless following of the crowd through the U.S. Capitol grounds and building that day is evidence of her lack of intent to do something inside the Capitol building that day, her lack of understanding where she was in the Capitol building, and her herd mentality, rather than a desire to execute a plan to stop the vote that was taking place in the Senate.

Mrs. Spencer's only intention that day was to have her voice heard. In fact, she had no idea where she was while she was in the Capitol building and to this day could not find her way around if given the opportunity.

**D.**     **The Charges and the Arrest of Mrs. Spencer**

On February 5, 2021, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Mrs. Spencer with two misdemeanor offenses related to her conduct on January 6. See Doc. 1.[2]  She was informed there was an arrest warrant for her so she voluntarily surrendered herself to authorities on February 8, 2021, where she was presented the same day in the U.S. District Court for the Middle District of North Carolina. She was released on personal recognizance. [3]

Mrs. Spencer had an initial appearance in the U.S. District Court for the District of Columbia on February 16, 2021, and, again, she was released on personal recognizance with conditions. On March 10, 2021, a five-count Indictment was lodged against both Mrs. Spencer and her husband, Christopher R. Spencer. She is charged as follows: (Count 2) 18 U.S.C. § 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds), (Count 3) 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), (Count 4) 40 U.S.C. § 5401(e)(2)(D) (Disorderly Conduct in a Capitol Building), and (Count 5) 40 U.S.C. § 5401(e)(2)(G) (Parading, Demonstrating or Picketing in a Capitol Building).

---

[2]

  Those two charges are: Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); and 40 U.S.C. § 5104(e)(2)(D),(G) - Violent Entry and Disorderly Conduct on Capitol Grounds.

[3]

  The initial charges and her arrest were widely publicized by various media outlets in the Winston-Salem, NC area. After her release on February 8, 2021, she  (and her husband/co-defendant) have been repeatedly "harassed" by news reporters and anonymous persons.

On September 9, 2021, Mrs. Spencer appeared before this Honorable Court via video conference and the Court accepted her voluntary plea of guilty to Count 5 – 40 U.S.C. § 5401(e)(2)(G) (Parading, Demonstrating or Picketing in a Capitol Building). The remaining Counts will be dismissed at the sentencing hearing.

## II.   LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense. Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling ther provision:

1.   The nature and circumstances of the offense and the hertory and characteristics of the defendant;
2.   The need for the sentence imposed;
3.   The kinds of sentences available;
4.   The kinds of sentence and the sentencing range…;
5.   Any pertinent policy statements issued by the Sentencing Commission;
6.   The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.   The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

### III.      FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a). *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A.      Nature & Circumstances of the Offense & the History and Characteristics of Mrs. Spencer

After Mrs. Spencer walked freely into the U.S. Capitol building on January 6, 2021, she was in awe. She had never been to Washington, D.C., or to the U.S. Capitol before. She had to take a moment and let it soak in. Together, she and her co-defendant (and their teen-age son) merely walked in, and through, then out of the building in a calm and non-agitated manner.

Compared to many other misdemeanor cases which have been filed in this Court, Mrs. Spencer's conduct is at or near the bottom of the scale. First, the defense is not aware of any evidence that her entry into the U.S. Capitol building was preplanned or coordinated with anyone else, including any extremist or organized groups. [4] Her intention was to attend the rally and that did not include going into the U.S. Capitol building or grounds. Although she does have a co-defendant who is facing a more serious charge, the facts show that Mrs. Spencer acted in peaceful concert with him. Second, the defense is not aware of any evidence

---

[4]        " Court records show that the vast majority of the roughly 650 people federally charged in the riot were not part of far-right groups or premeditated conspiracies to attack the Capitol."  *See*, https://www.washingtonpost.com/dc-md-va/2021/11/09/rioters-charges-arrests-jan-6-insurrection/

that the defendant incited others to commit acts of violence or destruction. Third, the defense is not aware of any evidence that the defendant engaged in any violence or questionable conduct towards law enforcement. In fact, it's just the opposite. Mrs. Spencer told the FBI that every interaction she personally had with the police was a positive experience. Fourth, the defense is not aware of any evidence that Mrs. Spencer destroyed or stole any property from the U.S. Capitol building. Fifth, based on the Government's investigation, it appears that Mrs. Spencer remained in a limited part of the building for a short period of time – approximately 20 minutes – mostly in hallways or the Rotunda area. The defense is not aware of any evidence that Mrs. Spencer entered any rooms or offices in the U.S. Capitol, or any personal space, or the Senate or House Chamber.

To her credit, Mrs. Spencer voluntarily surrendered herself when she heard that there was an arrest warrant for her. She has fully acknowledged her misconduct by answering pointed questions by the FBI agents in interviews, including her expressions of true and full contrition. She was relieved by the opportunities to take responsibility for her actions. [5]

Mrs. Spencer did not come to Washington, D.C., with the intention of subverting democracy. Mrs. Spencer came to our Nation's Capital to peacefully protest what she believed at that time to be a fraudulent election. By the time Mrs.

---

[5]

She first met with the FBI on January 19, 2021, where she unhesitatingly admitted she did indeed enter the U.S. Capitol building on January 6, 2021. Furthermore, on May 19, 2021, she voluntarily participated in another conference with FBI Agents to discuss her activities on January 6, 2021. And, moreover, she has expressed her interest in cooperating with the U.S. House Special Select Committee investigating the events of January 6, 2021, if asked to do so.

Spencer arrived at the U.S. Capitol grounds around 2:00 p.m., many of the barriers that had been erected along the perimeter of the building were no longer present. Mrs. Spencer and her co-defendant met no resistance in their walk to and inside the Capitol building . At the time, Mrs. Spencer didn't dream she'd be charged for going into the building.[6]  After seeing the video footage showing protestors beating police officers, spraying gas in their faces, screaming obscenities, and destroying property, it made Mrs. Spencer cringe. She did not witness any of  that at all. She is left with deep regret, fear, shame, and remorse.

The government concedes that Mrs. Spencer committed no violent acts and destroyed no property. Her actions within the U.S. Capitol have been tracked on the CCTV footage [7] and this demonstrates that while unlawfully present in the Capitol with no excuse, she did not destroy property, steal property, commit violent acts, or encourage others to do so. She entered and exited through doors. And when she spoke to police officers, it was non-confrontational and respectful, even grateful. After Mrs. Spencer exited the U.S. Capitol building she heard that someone had

---

[6]
  Notably, the Department of Justice has declined to bring criminal charges against the speakers or organizers of the rally; the only legal actions initiated against them being civil in nature. *See Thompson et. al., v. Trump et. al.*, 21-cv-00400, ECF No. 1 (Feb. 16, 2021); *Swalwell v. Trump et. al.,* 21-cv-00586, ECF No. 1 (Mar. 5, 2021); *Smith et. al. v. Trump et. al.,* 21-cv-02265, ECF No. 1 (Aug. 26, 2021).  And to think that the lawyers that brought the frivolous election lawsuits have not been sanctioned is mind boggling. At the very least they should be reprimanded for filing the appeal in the Michigan case in the  Federal Circuit instead of the Sixth Circuit.

[7]
  Since Mrs. Spencer plead guilty, it is believed the Government has scoured additional CCTV and other video footage in an attempt to "catch"Mrs. Spencer engaging in violence or other disruptive behavior. After several more discovery productions since her plea, there is none.

been shot and there was a curfew beginning that evening. Importantly, there were no police officers telling her not to go up the steps. This has been a long road for Mrs. Spencer and her family. Fortunately, she has a supportive relationship with her immediate family who has stood by her since the beginning of this case as well as a supportive extended family.

Mrs. Spencer pled guilty at an early stage in the proceedings thus saving valuable judicial resources. It is of utmost importance to Mrs. Spencer that this Court understand that she is incredibly remorseful for her actions on January 6, 2021. There is no doubt that, as she expressed when interviewed by law enforcement, she wishes she had never come to Washington, D.C., on that day. Mrs. Spencer has endured life-long damage to her reputation. None of this will be erased from the internet – it may be there forever. She has fully accepted responsibility for her bad judgement in entering the Capitol building by pleading guilty in what can be described as the "first wave" of defendants that pled guilty. She has been the subject of a number of media accounts lumping her with others that were there on January 6, 2021. Her personal character and reputation will forever be tarnished. Mrs. Spencer's family, including her parents and children, will suffer as well since they are inextricably intertwined with her.

Mrs. Spencer does not seek to minimize the harm caused by her behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that she did no harm, intended no harm, and regrets that she was even there. Most telling about Mrs.

14

Spencer is despite all she has been through this past year, she continues to hold-up her head high and is otherwise a well-respected member of her community.

As noted in the PSR, Mrs. Spencer has had minor contacts with the criminal justice system. Her law abiding life and her post arrest behavior show that she is capable of being a productive citizen and the Court can rely on that as a basis to sentence her to a term of probation considering the §3553 factors.

Mrs. Spencer was born in Winston-Salem, North Carolina, and she has lived in North Carolina her entire life. As an only child, she was raised by both parents in a normal and supportive home. In 2003 she married Christopher R. Spencer (co-defendant) and they have five children ranging in ages from 5 to 17. ███████████ ██████████████████████████████████Her children are dependent on her and her husband for financial and emotional support.

Mrs. Spencer is employed full-time as a cashier in a local restaurant. She works daily 8:00 a.m. to 3:00 p.m. This income supplements her husband's income as they, together, support the family.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████

Attached to this Memo are several letters from people who have known Mrs. Spencer for many years. Respectfully, these letters of support illustrate that a sentence of a term of short probation is appropriate in this case.

**B.**   **Need for the Sentence Imposed**

**1.**   **General Deterrence – 18 U.S.C. § 3553(a)(2)(B) – to Adequately Deter Others From Criminal Conduct.**

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation. The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the U.S. Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a family impoverished when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to be counterproductive, and labeled as political posturing.  A period of probation does constitute punishment and will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms. The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of

16

Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

### 2.  Specific Deterrence – 18 U.S.C. § 3553(a)(2)(C) – to Protect the Public From Further Crimes of the Defendant

Mrs. Spencer's likelihood of recidivism is very low. She has expressed genuine remorse and contrition, has cooperated fully with law enforcement, turned over evidence voluntarily, and she accepted the first plea offer tendered with no hesitation. Her acceptance of responsibility was complete and without reservation. She has never tried to minimize her behavior. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id.*; See *also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between

sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Given Mrs. Spencer's age (38), and other issues consistent with what is mentioned above, the likelihood of Mrs. Spencer ever re-offending is as close to zero as one might come. A punishment of any jail time in this case is going to have the exact opposite effect than what is in the interest of justice. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice.

Mrs. Spencer urges the Court to adopt the Probation Office's recommendation in this case and impose a probationary sentence in light of her significant family obligations, her sincere and complete remorse, her early and consistent acceptance of responsibility, and the lack of a need to further deter her.[8]

### C. The Kinds of Sentences Available

The Court should not consider any conduct that Mrs. Spencer did not plead guilty to. As noted herein it does not appear that Mrs. Spencer exercised managerial authority over any other participant and she was average or minor participant whose conduct was not peripheral to the advancement of the offense.

---

[8] For those in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no hertory of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 29 (May 2004).

Largely because: (1) Her lack of preparation or planning prior to January 6, 2021, to be part of the U.S. Capitol breach event, and her peaceful, non-destructive and non-violent behavior that day both outside and inside the U.S. Capitol building, and (2) her immediate cooperation with law enforcement officers when arrested, as well as her ongoing cooperation and willingness to resolve her case at the earliest opportunity, Mrs. Spencer asks that the Court to impose a short term of probation with community service hours.

In the alternative, she asks that the Court consider a non-custodial sentence with a restriction that she remain on her property except for work and excused absences to go to church and medical appointments – for either herself or for her children. In the event the Court finds a period of incarceration warranted, Mrs. Spencer asks that she be allowed to serve it on weekends which is what the Court did in *United States v. Johnny Taylor,* 15-cr-76 (BAH). [9]

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered to pay a fine in this case. Defendant's financial condition is such that she cannot pay any significant fine. *See* PSR, ¶58.

### D.    <u>The Need to Avoid Unwarranted Sentence Disparities</u>

If this Court were to impose a sentence greater than a probationary term, community service, and restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing in this

---

[9]

Furthermore, there is a remarkable cost savings to the taxpayers of the United States if the Court imposes a period of probation rather than a term of incarceration. As noted in the PSR, (¶74) the monthly cost of imprisonment is $3,688.00, $2,980.00 for community confinement, and $371.00 monthly for supervision.

Court. The following cases are a sampling where, in January 6th U.S. Capitol breach

cases, a misdemeanor(s) was charged and pled to and, for the most part, resulted in

no incarceration. Ms. Spencer's case is similar to:

- *United States v. Eliel Rosa*, 21-cr-00068 (TNM) (Oct.12, 2021) (sentenced to 12 months probation – Mr. Rosa accepted responsibility early on, did not pre-plan or coordinate activities, and did not go far into the U.S. Capital building.)

- *United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced to 36 months probation).

- *United States v. Jennifer Parks,* 21-cr-00363 (CJN) (Dec. 8, 2021) (sentenced to 24 months probation where govt. ask for 30 days home detention.

- *United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021) (sentenced to 36 months probation).

- *United States v. Jonathan Sanders,* 21-cr-00384 (CJN) (Nov. 4, 2021) (sentenced to 36 months probation where defendant showed lack of remorse during an FBI interview, and govt. recommended 2 months home detention ).

- *United States v. Jordan Stotts,* 21-cr-00272 (TJK) (Nov. 9, 2021) (sentenced to 24 months probation where defendant shouted at MPD officers and posted non-remorseful comments following January 6th ).

Furthermore, Ms. Spencer's case may be distinguished from a sampling of

cases where the sentence imposed was more than just probation:

- *United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to 2 months home detention even though she entered through a broken window and yelled at police officers).

- *United States v. Andrew Bennett,* Crim. No. 21-227(JEB)(Oct 1, 2021)(sentenced to three months home confinement and 36 months probation). According to the government, who recommended probation with a short term of home confinement, Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a

whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to her Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!". On January 6, according to the government, Bennet began live-streaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to live-stream events inside the building.

- *United States v. Derek Jancart and Erik Rau*, 21-cr-00467 (JEB)(Sept. 29, 2021) Judge Boasberg sentenced both defendants to 45 days of incarceration. However, in that case, unlike Mrs. Spencer's, the prosecutors asked for four (4) months of incarceration for each defendant, citing that the men came to D.C. with gloves, a gas mask, and two-way radios. *Id.* Additionally, Mr. Jancart posted a video on Facebook during January 6, where he is heard laughing at police while Mr. Rau screamed, "We have you surrounded!" Additionally, Mr. Rau, unlike Mrs. Spencer, was on probation at the time of her offense on January 6 for domestic violence.

- *United States v. Matthew Mazzocco*, 21-cr-00054 (TSC)(Oct. 4, 2021). (45 days of incarceration, defendant blamed the violence that day on Antifa, deleted his social media accounts in an effort to obscure his actions, and refused to give law enforcement access to the body-worn camera he wore that day, claiming that he did not know where it was. https://www.washingtonpost.com/dc-md-va/2021/10/04/capitol-riot-jail-deter-mazzocco/

- *United States. v. Reeder*, 21 CR 166(TFH)(Oct. 8, 2021), (Defendant sentenced to 90 days incarceration, bragged on social media about having engaged in battles with the police inside the Capitol, showed no remorse or contrition, claimed he had no idea he could not be in the Capitol despite being tear-gassed, recorded attacks on police officers inside the Capitol, entered a second time *by forcing himself past police officers who were trying to clear the Capitol*, posted videos bragging about her actions and deleted social media accounts, and most importantly, put his hands on a police officer. Even after pleading guilty, according to the government, he portrayed himself as an innocent victim of circumstances)

None of this is to suggest that any of these examples should have received a sentence of incarceration / home detention, only to suggest that there is nothing materially different about Mrs. Spencer or her conduct which would justify a sentence of incarceration / home incarceration. Judges of this district court have sentenced some January 6th misdemeanor cases to home detention / incarceration. However the nature and circumstances of those offenses, as well as the history and characteristics of the defendants in those cases, are based on far more egregious conduct than the conduct of Ms. Spencer – and therefore are readily distinguished.

Mrs. Spencer was far more cooperative with law enforcement, did not attempt to hide any evidence, and she has not publicly blamed another group for the violence that day. All told, the facts of the offense conduct and characteristics of the defendants who garnered incarceration were starkly different than Mrs. Spencer's conduct and characteristics.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons and such other reasons that may appear just and proper, Mrs. Virginia Marie Spencer respectfully asks this Court to fashion a sentence of 12 months probation with community service hours. This sentence is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a). It would be a sentence in the best tradition of federal judicial discretion, which will consider Mrs. Spencer as an individual and account for her unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*,

551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct.

2053 (1996).

Respectfully submitted,


_____-*S*-_____
Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. 301-984-8005
Cell Phone No. 301-807-3847
Fax No. 301-984-8008
aorenberg@orenberglaw.com


Dated: December 29, 2021