```
 1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2       - - - - - - - - - - - - - - - x
         THE UNITED STATES OF AMERICA,
 3                                               Criminal Action No.
                          Plaintiff,             1:21-cr-00147-CKK-2
 4                                               Friday, January 7, 2022
         vs.                                     11:01 a.m.
 5
         VIRGINIA MARIE SPENCER,
 6
                          Defendant.
 7       - - - - - - - - - - - - - - - x
         _____
 8
                         TRANSCRIPT OF SENTENCING HEARING
 9          HELD BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                         UNITED STATES DISTRICT JUDGE
10       _____

11       APPEARANCES:

12       For the United States:        DOUGLAS COLLYER, ESQ.
                                        DOJ-USAO
13                                      Gateway Building
                                        14 Durkee Street, Room 340
14                                      Plattsburgh, NY 12901
                                        (518) 314-7800
15                                      douglas.collyer@usdoj.gov

16                                      JAMIE CARTER, ESQ.
                                        555 4th Street, NW, Ste 3640
17                                      Washington, DC 20530
                                        (202) 252-6741
18                                      jamie.carter@usdoj.gov

19       For the Defendant:            ALLEN HOWARD ORENBERG, ESQ.
                                        THE ORENBERG LAW FIRM, P.C.
20                                      12505 Park Potomac Avenue
                                        Potomac, MD 20854
21                                      (301) 984-8005
                                        aorenberg@orenberglaw.com

22       Court Reporter:               Lisa A. Moreira, RDR, CRR
                                        Official Court Reporter
23                                      U.S. Courthouse, Room 6718
                                        333 Constitution Avenue, NW
24                                      Washington, DC  20001
                                        (202) 354-3187
25
```

1              P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Criminal Case 21-147, *The*

3    *United States vs. Virginia Spencer*.

4              Counsel, would you please identify yourself for

5    the record starting with the government.

6              MR. COLLYER:  Assistant United States Attorneys

7    Douglas Collyer and Jamie Carter for the United States; good

8    morning, Your Honor.

9              THE COURT:  Good morning.

10             MR. ORENBERG:  Good morning, Your Honor; Allen

11   Orenberg on behalf of Virginia Spencer.  And also

12   accompanying Ms. Spencer, although you cannot see here on

13   the screen, are several of her family members including some

14   of her children and her friend, Christina Walton.

15             THE COURT:  All right.

16             THE COURTROOM DEPUTY:  Can the probation officer

17   also identify herself.  Thank you.

18             THE PROBATION OFFICER:  Good morning, Your Honor;

19   Aidee Gavito with the probation office.

20             THE COURT:  All right.  And I see Ms. Carter from

21   the government as well.

22             MS. CARTER:  Yes, Your Honor, good morning.

23   Mr. Collyer will speak for the government.

24             THE COURT:  You're going to have to speak up a

25   little more, if you're going to talk.

```
1              MS. CARTER:  Yes, Your Honor.

2              THE COURT:  All right.  Ms. Spencer, are you

3     willing to proceed with this by video?

4              THE DEFENDANT:  I am, Your Honor.

5              THE COURT:  All right.  So let's go forward.

6              This is a sentencing.  Ms. Spencer pled guilty to

7     Count 5, parading, demonstrating, or picketing in a Capitol

8     Building.  It's a misdemeanor.  Maximum six months in jail,

9     $5,000 maximum fine, and restitution she's agreed to of $500

10    at sentencing.  At the conclusion Counts 1 through 4 will be

11    dismissed.  I believe that she is in compliance with her

12    pretrial conditions last I looked.

13             I have a presentence report; the government's

14    memorandum in aid of sentencing; the defendant's memorandum

15    in aid of sentencing, which had seven attached exhibits,

16    which relates to her drug treatment; letters of support,

17    which involve three friends, also one from her daughter,

18    mother-in-law, and her daughter's friend.  The government

19    also filed three videos.

20             Do I have everything that was filed for me to

21    consider?  If you're silent, I'll figure that I have

22    everything.  If I don't, speak up.

23             I don't hear anything.  Okay.

24             In terms of objections, there were none to the

25    presentence report so as the presentence report is
```

1    undisputed, the Court makes findings of fact pursuant to

2    Federal Rule of Criminal Procedure 32(i)(3)(A), and I'll

3    adopt the presentence report as written.

4           I can now hear from the government, defense

5    counsel, and the defendant, if she wishes to address the

6    Court.

7           One thing I did want to ask initially is the

8    government indicated that Ms. Spencer and her co-defendant

9    husband, that they had brought their 14-year-old son to the

10   Capitol.  Is there a dispute about that, or is that correct?

11          MR. ORENBERG:  Your Honor, on behalf of

12   Ms. Spencer there's no dispute about that.

13          THE COURT:  Okay.

14          MR. ORENBERG:  At least from our -- okay.

15          THE COURT:  I just wanted to make sure that there

16   wasn't an issue about that.

17          All right.  Let's proceed then.  Let me hear from

18   the government, whoever wishes to address the Court.

19          MR. COLLYER:  Good morning, Your Honor; thank you.

20          Your Honor, the events of January 6, 2021, left a

21   stain on the history of this nation.  Each individual

22   participant contributed to the international embarrassment

23   that is the January 6th Capitol Riot.

24          I'm sure by now the Court is aware of generally

25   what took place 366 days ago so I will not belabor it.  The

1    government's sentencing recommendation today in this case is

2    based on the individual actions that Ms. Spencer took that

3    day.

4           While walking to the Capitol, the defendant joined

5    a group that got into a verbal and physical altercation with

6    a counter-protester stopping after Metropolitan Police

7    physically separated the man from the group.  Body-worn

8    camera captures the defendant yelling at the man, "Defund

9    the police.  They're protecting your stupid ass.  Look who's

10   protecting you.  Let's defund the goddamn police.  Defund

11   the fucking police."

12          The defendant arrived at the Capitol in an

13   agitated state.  She brought with her her 14-year-old child

14   into the Capitol during the riot.  Through her own

15   admissions, she observed law enforcement shoot tear gas, use

16   percussion grenades, and make at least one arrest as she

17   approached the Capitol.  Undeterred by these observations,

18   the defendant pressed forward to the Capitol Building with

19   her child in tow.

20          She entered the Capitol at approximately 2:19 p.m.

21   through the Senate Wing door approximately six minutes after

22   the initial breach of the building by rioters at this exact

23   location.  The breach left behind visibly damaged doors,

24   windows, broken glass, and audible alarms.

25          She joined the crowd that surged past police

1      officers trying to hold the rioters back in the Crypt.  The

2      defendant acknowledges seeing people clash with police here.

3      Though not at the front, Ms. Spencer formed part of this

4      critical mass needed to overwhelm the police to gain further

5      access to the building.

6              Ms. Spencer then moved to the small House rotunda

7      and proceeded upstairs.  There she briefly went into a suite

8      of offices assigned to Speaker of the House Nancy Pelosi as

9      recorded on a Facebook Live video by her husband.  Of note,

10     Speaker Pelosi had staff members who were trapped inside of

11     a room in that office suite hiding under a table while

12     rioters patrolled the hallways calling for Speaker Pelosi.

13     When the Spencers left that suite, they watched as someone

14     ripped the sign that hung above the suite that said "Speaker

15     of the House Nancy Pelosi" off the wall and then they

16     watched as other people smashed that sign to pieces.

17             She joined another crowd that formed outside the

18     House of Representatives' Chamber that attempted to enter

19     the chamber while the law makers were still trapped inside.

20             I'd like to play Government's Exhibits 1 and 2 for

21     the Court at this time which consists of clips of a Facebook

22     Live video made by the defendant's husband of this area

23     outside the House door.

24             THE COURT:  All right.

25             MR. COLLYER:  Behind the door prominently featured

1    in the first clip as people escalate from yelling "Open the

2    Door" to chanting "Break It Down" members of Congress were

3    hiding under desks and chairs and Capitol Police had weapons

4    drawn.

5                (Videos playing)

6                MR. COLLYER:  Although Ms. Spencer was not at the

7    front of this group and not vocal, for approximately nine

8    minutes she was part of this particular mob who were

9    chanting to break down the House Chamber door to get to

10   members of Congress.

11               Throughout her time in the Capitol, she witnessed

12   violence against law enforcement yet continued to

13   participate.  As she stood in a hallway east of the House

14   Chamber, a group of officers attempted to move down the

15   hallway but were attacked by a rioter.  The defendant's

16   husband verbally taunted the officers while other rioters

17   slid furniture at them.

18               The defendant moved towards an exit but then

19   turned around and went back into the hallway despite being

20   in clear view of an exit from the building just yards away.

21               At this time the government would like to play

22   Exhibit 3, another clip from a Facebook Live video of this

23   incident made by the defendant's husband.

24               THE COURT:  If the defendant is in this video, can

25   you point her out?  Or is she not in it?

1          MR. COLLYER:  She is not featured in this video.

2          THE COURT:  Okay.

3          MR. COLLYER:  This is just a video of the

4     incident.

5          THE COURT:  All right.

6          (Video playing)

7          MR. COLLYER:  Ms. Spencer finally exited the

8     Capitol at approximately 2:52 p.m. through the doors located

9     just behind them in this video, meaning they spent

10    approximately 33 minutes inside the Capitol Building.

11          When Ms. Spencer was interviewed by the FBI two

12    weeks later, she minimized her conduct, specifically telling

13    the FBI that she and her family were pushed into the

14    building by the crowd and didn't have a choice.  But that

15    was refuted by video showing a voluntary stroll to the

16    Senate Wing door.

17          She stated to FBI that upon entering the Capitol

18    she and her family said something to the effect of "We gotta

19    get out of here," but that's contradicted by their stay

20    inside of more than 30 minutes, their statements inside, and

21    their participation in multiple groups of rioters who broke

22    through the police line and attempted to breach the house

23    chamber door.

24          A conversation the defendant recounted having with

25    a Capitol Police officer reveals the sense of entitlement

1    that she and the other rioters had.  The defendant says she

2    told the police officer, "This is not only for us.  This is

3    for y'all too," evincing that by attacking the Capitol the

4    defendant thought she was embarking on a noble endeavor as a

5    representative of the citizenry.  She could not have been

6    more wrong.

7            Any assertion that Ms. Spencer values the

8    Constitution or the foundation of the government is belied

9    by her actions on January 6th where, as part of a mob, she

10   helped disrupt the peaceful transfer of power, the

11   cornerstone of our democracy.  She was not forced into the

12   Capitol by a crowd.  She voluntarily entered after

13   proceeding past barricades, through tear gas and percussion

14   grenades, and after witnessing at least one arrest.

15           Inside she was part of three mobs:  one in the

16   Crypt that overwhelmed police to gain further access to the

17   building, one that invaded Speaker Pelosi's office suite,

18   and one that demanded entry to the House Chamber.  Inside

19   she was twice in an area where police released tear gas to

20   disperse rioters.  She witnessed the group's confrontation

21   with police as shown in that last video, and, rather than

22   leave, she continued to participate.  And of course she did

23   all this with her minor child in tow.

24           For the reasons discussed today and outlined in

25   the sentencing memorandum, the government is seeking a split

1 sentence of incarceration and probation in this case.  18

2 USC 3561(a)(3) states the general rule that imposition of

3 both probation and straight imprisonment in the same

4 sentencing hearing is not permitted; however, this general

5 prohibition against sentences of probation combined with

6 continuous incarceration does not apply where the defendant

7 is sentenced for a petty offense.  There is no dispute that

8 Ms. Spencer is being sentenced today for a petty offense.

9        In the *United States v. Posley*, the defendant was

10 convicted of DWI on federal property and sentenced to two

11 years probation with the first six months in prison.  In

12 affirming that sentence the Fourth Circuit concluded that

13 3561(a)(3) unquestionably provides statutory authority to

14 sentence petty offense defendants to a term of six months

15 continuous imprisonment plus probation.  Permitting a

16 combined sentence of continuous incarceration and probation

17 for a petty offense is also sensible because Courts cannot

18 impose a term of supervised release on petty offense

19 defendants like a Court can in any other type of sentencing.

20        A recent poll by CBS News found that 62 percent of

21 Americans surveyed expect violence from the losing side in

22 future elections while only 38 percent expect the losing

23 side to concede peacefully.  To prevent January 6, 2021,

24 from becoming the new normal in this country following an

25 election, this Court must send a message that there are

1    consequences for what took place that day; this Court must

2    send a message that what happened on January 6th was

3    unacceptable; and this Court must send that message now.

4         Balancing the factors outlined in 18 USC 3553(a),

5    the government respectfully requests this Court sentence

6    Virginia Spencer to the $500 of restitution to which she has

7    agreed, three months of incarceration, and 36 months of

8    probation.

9         Thank you.

10        THE COURT:  All right.  Before -- Mr. Orenberg,

11   before you go forward, I did want to put something on the

12   record.

13        At various places in the presentence report it

14   states, quote, At the request of counsel the information has

15   been excluded from the presentence investigation report.

16   The probation officer does have the information in the

17   notes.  I must say that I've never seen that done, but

18   probation does have the information.  But the Court does not

19   have it in the presentence report and government counsel

20   definitely does not.  As to the nature of the information

21   excluded, I did speak to Ms. Gavito to find out generally

22   what it related to to see whether it was something that

23   should be necessarily included in the report.

24        I'm going to rely on defense counsel's decision

25   not to put that information in and that it shouldn't be

1    there, but that also means that the Court isn't going to

2    rely on it, and neither Ms. Spencer nor Mr. Orenberg get to

3    argue based on those things.  Because if they're not in the

4    report and the government doesn't have access to it, you

5    don't get to say anything about it.

6            So it's basically your decision that this

7    information is not relevant to the Court.  Most of it is

8    about her and her family history or information of that

9    nature.  I am just simply saying that the -- evidently there

10   seems to be some concern about the public -- the presentence

11   reports are sealed on the docket.  The government has access

12   to it as does the parties with a Court order, but, as I

13   said, probation does have the information if at some later

14   point it becomes pertinent.  At least at this point it's not

15   going to be used, okay?  If defense counsel and the

16   defendant wants to use this material as it relates to the

17   family, the family issues, then it should be in the report.

18   If it doesn't at this point (unintelligible).

19           Mr. Orenberg.

20           MR. ORENBERG:  Thank you, Your Honor.

21           First of all, let me address what the Court just

22   addressed us about.  No, we will not be relying upon that

23   information in my remarks today, and Ms. Spencer will not be

24   referring to that information either.

25           Also, before I begin my remarks, I would like to

1    inform the Court that Ms. Spencer does want to address the

2    Court; and furthermore, this morning she notified me that

3    her daughter Genesis Spencer and her daughter's boyfriend,

4    Trent Shumate, would also like to briefly address the Court.

5    I did not have time to file a proposed witness list since

6    she just notified me that these two people would like to

7    address the Court.

8              THE COURT:  I believe both of those individuals

9    did write a letter so I do have information.  Is there

10   anything additional that they're going to add that's not

11   already in the letters?

12             MR. ORENBERG:  Your Honor, I did not have time.

13   She just informed me -- I'm sorry?

14             THE COURT:  I said I'm not precluding them, but I

15   do have information from them because they both wrote a

16   letter.

17             MR. ORENBERG:  I think they'll be brief, Your

18   Honor.

19             THE COURT:  All right.  As long as it's very

20   brief.  And my suggestion is that we hear from the family

21   before we hear from you.

22             MR. ORENBERG:  Okay.

23             THE COURT:  I would have preferred, frankly, if

24   this had been said before the government got to say

25   something so if they wanted to respond to something they

1    would have been in a position to do so, but it may not

2    require a response.

3         But whoever it is that wants to speak, why don't

4    they do so now.

5         MR. ORENBERG:  Okay.  Is Genesis Spencer

6    available?

7         Ms. Spencer, please --

8         THE COURT:  Give us your name, please.

9         MR. ORENBERG:  Yes.

10        MS. GENESIS SPENCER:  My name is Genesis Spencer.

11   I'm my mom's first daughter.

12        THE COURT:  Okay.  So you're the oldest child.

13        MS. GENESIS SPENCER:  Yes, ma'am.

14        THE COURT:  All right.  Go ahead.

15        MS. GENESIS SPENCER:  I just want to say a few

16   things about the kind of person that my mom is.  Some of

17   the -- some of the things that have been like said about her

18   and addressed about her are very much untrue.  My mom would

19   not do something like this on purpose.

20        I've heard a lot about this being since it's been

21   all over the news, and, you know, obviously I've heard it

22   from both of my parents.  She is very much a good mother and

23   in no shape or form would put any of her kids in any kind of

24   harm.

25        She goes out of her way all the time to help

1    people.  She's a very hard worker.  Like this -- she's a

2    very good person in general, and, you know, like just some

3    of the things that are being said are just, you know --

4             THE COURT:  All right.  Are you -- anything else

5    you want to say?

6             MS. GENESIS SPENCER:  No, ma'am.

7             THE COURT:  Let me point out that your mother did

8    agree, as part of this plea, that what she did was something

9    that was unlawful.

10            MS. GENESIS SPENCER:  I understand.

11            THE COURT:  So it's not something where she just

12   sort of wandered in.  She wasn't a tourist.  This is

13   something that she agreed to, and she knew that she was

14   unauthorized to be in there.  So you're indicating that it

15   wasn't on purpose; that's not correct.

16            I'm not disputing the fact that you view her as a

17   loving mother, and I do have your letter and all the letters

18   that indicate that she's been very supportive of others as

19   well as family members.

20            MS. GENESIS SPENCER:  Yes, ma'am.

21            THE COURT:  Just understand that her plea

22   agreement indicated she agreed that she shouldn't have been

23   there, and she knew she shouldn't have been there, and she

24   went there purposefully.

25            MS. GENESIS SPENCER:  Yes, ma'am, but I'm just

1    trying to like -- I'm just trying to let you all -- let you

2    know that she would never hurt anybody.

3              So I'm speaking on behalf of the articles talking

4    about my 14-year-old brother being there.  She would never

5    intentionally bring him to hurt him or put him in any kind

6    of harm or anything like that.

7              THE COURT:  Well, I'll address that later, but I

8    understand what you're saying.

9              MS. GENESIS SPENCER:  Yes, ma'am.

10             THE COURT:  Anything else?

11             MS. GENESIS SPENCER:  That's all.

12             THE COURT:  Okay.

13             MS. GENESIS SPENCER:  Thank you.

14             THE COURT:  I believe there's somebody else.

15             MR. ORENBERG:  Mr. Shumate.

16             MR. SHUMATE:  Hey, how are you all doing?

17             THE COURT:  All right.  I'm fine.  If you can give

18   us your name, and spell your last name so we make sure we

19   have it correct for the court reporter.

20             MR SHUMATE:  My name is Trent Shumate, last name

21   S-H-U-M-A-T-E.

22             THE COURT:  Okay.  Go ahead.  I do have your

23   letter, but go ahead.

24             MR. SHUMATE:  I've known Ms. Virginia Spencer for

25   almost two years now, and ever since the start she's always

1    brought me in like her own kid, you know?  She's always been

2    respectful and kind to me.  I love her like my own mother.

3    Like she's always willing to help me.  If anything --

4    there's been times at work where I've been -- like I got

5    hurt at work actually yesterday, and, you know, she's

6    willing to like ask me if I need anything, need a ride to

7    the doctor or anything.  She's always been there for me, and

8    I love her for that.

9            THE COURT:  Okay.  Well, I hope you're all right.

10           MR SHUMATE:  Thank you.  I appreciate it.

11           THE COURT:  Okay.  All right.  Thank you.

12           MR SHUMATE:  Thank you.

13           MR. ORENBERG:  Thank you, Your Honor.  Does the

14   Court want to hear from Ms. Spencer now or after?

15           THE COURT:  No, go ahead.

16           MR. ORENBERG:  I should go ahead?

17           THE COURT:  Yes, go ahead.

18           MR. ORENBERG:  Okay.  All right.  Thank you, Your

19   Honor.

20           THE COURT:  I just wanted -- sometimes with other

21   speakers it's helpful to have them go first so if things

22   need to be addressed it gives you an opportunity to do so.

23           MR. ORENBERG:  Right.

24           Your Honor, listening to Mr. Collyer's remarks and

25   of course the Court's observations so far to date, I want to

1    point out we -- Ms. Spencer is not trying to hide from or

2    run away from what she told the Court back in September,

3    which she admitted to doing, which was, you know, being

4    there, not being there lawfully, and that, you know, she was

5    there for approximately 33 minutes in the United States

6    Capitol.  Anything that's been put before the Court today

7    she's not trying to, as I said, run away from that.  She's

8    not -- she has fully accepted responsibility.

9            Literally from the beginning of this case, when

10   she was initially interviewed by the FBI agents a couple of

11   weeks after January 6th last year, she -- it's my

12   understanding that at that time she felt that she was being

13   fully candid and open and cooperative with the law

14   enforcement officers.  There may have been, perhaps, a

15   misunderstanding by her about the questions that the FBI

16   agents posed to her about her involvement that day, but she

17   was not trying to minimize or run away from her conduct.

18   She has been completely cooperative, literally since Day 1.

19           I've known her now since just about the same

20   time -- well, it was a few weeks after she was interviewed.

21   I first met Ms. Spencer in late February of this past year,

22   and I have spent many hours talking to her about, you know,

23   what happened and about her family and about her background.

24   I have found Ms. Spencer to be genuinely remorseful and open

25   and candid about everything that happened that day and, as I

said, about her life which led up to January 6th.  It's

clear in my mind, and I think the government does not

disagree with me, that she was not involved with any

preparation or planning of the events that occurred in

connection with the Capitol breach on January 6th, and

overall her conduct was -- I'm going to say it was peaceful,

nondestructive, and nonviolent that day both outside and

inside the U.S. Capitol.

Sure, she was part of a crowd.  I know it's been

referred to as a mob, but she was part of a crowd that was

spurned on by what occurred down at The Ellipse, at the

rally on The Ellipse.  And they marched up to the U.S.

Capitol and inside the U.S. Capitol, but she did not have

any intentions to do so until the rally on The Ellipse came

to a conclusion and she, along with her co-defendant husband

and her child, walked up Pennsylvania Avenue to the U.S.

Capitol grounds.

Your Honor, as I said, her -- I'm not aware of any

evidence -- and I don't think the government can point to

any evidence -- that shows that her entry into the U.S.

Capitol Building itself was preplanned or coordinated with

anyone else, including any extremist or organized groups.

As I said, her intention was to attend the rally,

but at that time it did not include going to the U.S.

Capitol grounds.  It was only near the end of the rally or

1    at the conclusion of the rally that she decided to go along

2    with her husband and child.

3          She -- you know, the government showed -- the

4    government filed, a few days ago, these three clips, that's

5    three video clips that show what happened inside the Capitol

6    in the area that Ms. Spencer was located.  I've reviewed it

7    with my client, of course.  I don't think

8    Mr. Collyer or the government can disagree with me that it

9    is not clear whether Ms. Spencer was, shall we say, yelling

10   as some of the other people were yelling.  It's clear -- and

11   the Court could ask her yourself under oath did she engage

12   in any of the conduct that appears on those three video

13   clips that the -- other than just standing around nearby.

14   In fact, in Mr. Collyer's submission or notice of filing of

15   the three video clips, in each paragraph attended to each

16   clip he says she was just standing nearby, she was just

17   standing nearby.

18          She was not engaged in any violence or

19   questionable conduct towards law enforcement.  She was just

20   part of that crowd that wound up in those particular areas

21   at that particular time.

22          I'd also say that there's no evidence -- I think

23   the government would agree with me -- that she either

24   destroyed or stole any property from the U.S. Capitol

25   Building.  Mr. Collyer makes reference to a sign in Speaker

21

1    Pelosi's hallway that was destroyed, but she had nothing to

2    do with that.

3          And I'm going to say to the Court she remained in

4    the U.S. Capitol for a limited period of time.  Thirty,

5    thirty-three minutes is not a long period of time.  Whether

6    or not she had an opportunity to leave the building prior to

7    that 33 minutes, that's a matter of interpretation of what

8    was

9    going on there.  Of course she was with her husband.  She

10   was with her son.  They were together.  They stayed

11   together.  And it's my understanding in almost a year of

12   talking to Ms. Spencer about this that they did leave when

13   they had the first opportunity to do so.

14         As I said, she's been cooperative with law

15   enforcement officers all throughout.  She voluntarily

16   surrendered herself when she heard that there was an arrest

17   warrant for her.  She had that first interview a couple of

18   weeks after January 6th, and then she was reinterviewed

19   later on in May of this past year.  I was with her by

20   telephone during that interview.  She was completely candid

21   and cooperative with law enforcement officers at that time.

22         I would say to the Court she entered this -- her

23   guilty plea to this petty offense at an early stage in the

24   proceedings, thus saving the Court and the United States

25   Attorney's Office valuable resources.

1          As I said to you when I first started talking, she

2     is incredibly remorseful for her conduct, for her actions on

3     that day.  She and I talk continuously, perhaps weekly, and

4     she has told me from almost the beginning of my professional

5     relationship with her about how hard -- what she has done

6     and the publicity that has come along with this in her

7     community just outside of Winston-Salem, North Carolina, has

8     been very, very difficult on her this past year.  She is

9     continuously hounded by the media.  She's attracted enormous

10    attention for the obvious reasons.

11         And she's lucky.  I mean, she has a very

12    supportive family and friends, as the Court is well aware

13    of, but to some extent she's become a pariah in her

14    community because, you know, people know about what

15    happened, and they read newspaper articles, or they see

16    television articles about Ms. Spencer that not -- that are

17    not always actually truthful.  And you heard a little bit

18    about this from her daughter Genesis Spencer, that perhaps

19    unfairly she's been painted too broadly with the brush about

20    what happened on that day.

21         She's not trying to, as I said, run away from her

22    actions and conduct that day, but the press down there in

23    that part of North Carolina have, on occasion, portrayed her

24    a little bit unfairly.

25         That comes with the territory in these cases.  I'm

1    seeing that happen in a number of other January 6th cases,

2    as perhaps the Court is well aware of, but this is of

3    extreme impact on Ms. Spencer's daily life.  She's a

4    productive member of her community.  She has a job right now

5    where she works in a local restaurant.  She's very

6    supportive of her children in all their school events, in

7    all their sporting events.  Many times when I get her on the

8    phone she's on her way from one sporting event for one child

9    or the other.  We talk about what her family -- what she

10   does for her family and with her family for the holidays and

11   for the birthdays.  She's a very loving and caring mother,

12   as the Court, I'm sure, is well aware of from the letters

13   and what she heard from her daughter and from Mr. Shumate.

14           Your Honor, there's no dispute that she's accepted

15   full responsibility for her actions and conduct that day.

16   Mr. Collyer made reference to, when he was summing up, what

17   the sentence should be in this case, that the Court should

18   impose the $500 fine.  Well, let me tell you, she paid it

19   already.  She paid it last Friday.  She paid $510.  I have a

20   confirmation email.  She told me that she worked through I

21   believe Ms. Schuck of this court to pay this ahead of time

22   rather than have it -- have the Court tell her to pay it.

23   She paid it during, you know, the next -- whatever period of

24   time that she may be under supervision of the Court.  All of

25   that shows extreme responsibility on the part of my client,

1    that she would go ahead and pay this ahead of time.

2          Your Honor, Mr. Collyer made, I guess, a bleak or

3    a slight reference to what's happening in other cases in

4    this court, other January 6th cases, and I know the Court is

5    well aware of the sentencings in other similar cases, in

6    cases that are all felony offenses.  But I did a quick

7    survey of the cases, the January 6th cases that have been

8    sentenced to date, and it seems that approximately -- I

9    don't know if I have this figure exactly right -- 56 or 57

10   cases have been sentenced to date involving the same offense

11   to which Ms. Spencer has pled guilty to, 40 USC

12   5104(e)(2)(G).

13         In approximately two-thirds of those cases the

14   Court, other judges in this court, have imposed a sentence

15   of either straight probation or a combination of straight --

16   probation with some period of home detention ranging from

17   one to three months.  There have been some 54 -- excuse me,

18   5104(e)(2)(G) cases that have involved a period of

19   incarceration, and I know that this Court is well aware of a

20   recent case where it did impose a period of probation.  It's

21   the *Camper* case.

22         Let me start with the *Camper* case.  I'm not going

23   to belabor the facts in the case, but obviously in that case

24   the facts surrounding Mr. Camper were far more egregious

25   than the facts surrounding Ms. Spencer in this case.

1              I would ask the Court -- I have already asked the

2      Court to sentence Ms. Spencer to a period of probation for

3      12 months, community service hours, and a short period of --

4      I'm sorry, 12 months probation.  The Court has the

5      discretion, as Mr. Collyer pointed out, to impose a sentence

6      involving incarceration and/or probation, but I would ask

7      the Court to also consider a period of probation and perhaps

8      a short period of home detention with work release

9      privileges so that Ms. Spencer can continue to work, she can

10     continue to attend church, and she can continue to attend to

11     her children's medical needs by taking them to doctors and

12     so forth.

13             And for all the reasons stated in my memorandum in

14     aid of sentencing and presented today, we would ask the

15     Court to consider that type of sentence.  Thank you.

16             THE COURT:  All right.

17             Ms. Spencer, you can address the Court now.

18             THE DEFENDANT:  Your Honor, I'm sorry, but I'm

19     extremely nervous.

20             THE COURT:  Well, take a few minutes to compose

21     yourself.  There's no rush.

22             (Pause)

23             THE DEFENDANT:  Okay, Your Honor.  Can you hear me

24     well?

25             THE COURT:  Yes.

1          THE DEFENDANT:  Okay.  This is addressed to you.

2     I was going to have my attorney like send it to you, but

3     then I figured I'd just read it to you.  That way everybody

4     can hear it.

5          THE COURT:  All right.

6          THE DEFENDANT:  Okay.  On January 6, 2021, I made

7     the decision to go to D.C. in support of Donald Trump, not

8     for the person he is, but for the policies that I felt made

9     America better.  Going back to the night before, I would

10    have never dreamed I would be where I am today.

11          I have had plenty of time over the past year to

12    reflect on the events that occurred on that day.  To use the

13    word "embarrassment" is an understatement.  To use the word

14    "ashamed" or to say that I'm ashamed is also an

15    understatement.  Words can't describe how much I regret

16    making the choice I made to put myself in that situation.  I

17    am constantly telling myself how stupid of a choice it was

18    that I made that day and how much of a fool I really am for

19    this.

20          Not only did my actions reflect on me, but it also

21    reflects on my entire family.  We've been harassed by local

22    and national media outlets.  I've received threats from

23    people that I don't even know towards me and my family.

24    We've been labeled as terrorists, and our lives have been

25    completely turned upside down.  I would give anything to go

1    back to the night before because I would have just stayed at

2    home.

3          This is a dark cloud that has followed me

4    everywhere every day.  There's not been a single day passed

5    that this has not weighed heavy on my mind and on my heart.

6    There's been nights where I've cried myself to sleep over

7    the decision that I made and the repercussions that have

8    come along with it and the repercussions that it has had on

9    my day-to-day life and on my children, on my parents, and on

10   all the people that I love.

11         My actions helped take up time and resources that

12   could have been used for other people and other things, and

13   for that I am truly sorry.  I'm truly sorry for my

14   participation on the things that resulted that day.

15         I apologize to my family.  I apologize to the

16   police officers, the politicians and their staff, the FBI,

17   the prosecution.  I apologize to my attorney.  I apologize

18   to you, but most important I would like to apologize to the

19   American people.  I will forever regret my role on January

20   6, 2021.

21         I pray that my actions won't define me as a person

22   because I am not a violent person.  I am actually the

23   complete opposite.  I am a very humble woman that happened

24   to make a very bad decision, and I also pray that one day I

25   can move past this and put it behind me and move forward

1   with my life, and that every single person that was affected

2   by my actions will find it in their heart to forgive me at

3   some point.

4          Thank you, Your Honor, for allowing me the

5   opportunity to speak and get this off my chest.  I'm very

6   sorry.

7          THE COURT:  All right.

8          THE COURTROOM DEPUTY:  Judge, may I interrupt?  I

9   understand the public line is not working.

10          THE COURT:  Okay.  Was it working and it's now not

11   working?

12          THE COURTROOM DEPUTY:  I just got an email saying

13   that it wasn't working.

14          THE COURT:  Well, we'll wait a few minutes to see

15   if we can get it back.

16          I'll tell you what.  I'm going to take a break

17   here anyway.  I want to consider what's been said.  So why

18   don't I just ask is there anything the government wants to

19   add at this point?  I'll take a break before I do the

20   sentencing.  We'll try to get the public line working again.

21          MR. COLLYER:  No, Your Honor.  Thank you.

22          THE COURT:  All right.  So let me -- I'm just

23   going to step away.  Every time I turn this thing off

24   there's a problem.  There have been times I've not been able

25   to get back.

1          So I have about 12 minutes to 12:00.  I'll come

2     back here probably around 12:00 or a little after, and in

3     the meantime let's see if we can do something with the

4     public line.  Thank you.

5          I would just suggest you all stay on and walk

6     away.

7          MS. CARTER:  Your Honor, if I may?  Our office

8     just notified us that the line just came on and that now you

9     can hear the Court, just so the Court is aware.

10          THE COURT:  Okay.  Thank you.

11          Was it off for a long period of time, or not?

12          MS. CARTER:  Yes, Your Honor.  I understand it has

13     been off until about 11:46, which is when it came back on.

14     I only was notified midway through the defense presentation,

15     and I apologize for not being -- I didn't want to interrupt

16     so...  I wasn't sure whether or not to interrupt to notify

17     the Court.

18          THE COURT:  Okay.  Well, that's unfortunate.

19          Okay.  I'm still going to take a break and review

20     the material.  I'll be back.  As I said, you can walk away

21     and not get off the Zoom so we don't have problems later.

22          (Recess taken)

23          THE COURT:  Let me just indicate that the public

24     line -- we don't -- you should always just interrupt.

25          We put on the public line.  We have no way of

1    knowing that it's not working.  We always make an assumption

2    it is unless somebody tells us otherwise.  There's really no

3    way of sort of telling whether it is or is not.

4            So it evidently went off at a particular point.

5    I've been told that some of the news media, *Rolling Stone* or

6    somebody, I guess, you know, was concerned because they

7    couldn't hear things.  There is obviously a transcript, but

8    I apologize for whatever the -- the phone thing, which I

9    have nothing to do with.

10           But if people are listening and they tell you,

11   interrupt because we do want to be able to have -- if people

12   cannot come to Washington to the courtroom, then the public

13   line is an important way of doing it, and we're assuming it

14   works.  Usually it does.  It's unusual for it to go down.

15   We've had more problems with IT sort of stuff in terms of

16   the videos than we have with the phone.

17           All right.  Let me proceed.

18           So the federal advisory sentencing guidelines do

19   not apply to this charge.  It is a petty offense, a

20   misdemeanor.  The penalty is a maximum six months in jail.

21   Probation can be up to five years.  There's no supervised

22   release.

23           So the Court has considered the pleadings, the

24   record, the arguments and the statements today in addition

25   to the following information in determining a fair,

1    appropriate, and reasonable sentence in conformance with

2    factors set out in 18 USC 3553(a) and subsequent sections

3    except for (e):

4          Ms. Spencer is 38 years old.  In terms of criminal

5    history convictions:  failure to notify DMV of address

6    change, time served to one day in jail; driving while

7    license revoked, 20 days in custody, although there were

8    other charges that were dismissed as part of the plea, which

9    I assume is part of the reason that -- and I assume it was

10   to time served.

11         In terms of arrests, there's only one:  killed an

12   animal by starvation and abandonment.  Charges were

13   dismissed two months later.

14         Drugs and physical condition.  As an infant and in

15   2001 she had cataract surgery.  She's been prescribed

16   methadone to assist in her opiate addiction.  She's not

17   vaccinated for COVID-19.  There are no issues in mental

18   health or emotional health.

19         In terms of substance abuse, first consumed

20   alcohol at Age 18, smoked marijuana at Age 15.  There is not

21   any continued use of marijuana.  At Age 26, developed an

22   addiction to opiates.  Started using someone else's

23   medication, then stopped at Age 28, was involved in

24   treatment which in 2011 relapsed; started in treatment again

25   and is still in treatment receiving methadone, and to her

1    credit she is in compliance with treatment.

2         Education.  Completed the tenth grade in high

3    school, has no additional training other than job

4    experience, and she has been -- has experience in the

5    restaurant field.

6         Job history:  2003 to 2006, waitress at a waffle

7    shop; 2000 to 2003, waitress for a Pizza Hut; and in 1998 to

8    2000, car hopper for a Sonic restaurant.  Since 2006 she's

9    been a homemaker.  She does have five children ranging in

10   ages from 5 to 17.

11        Counsel reports -- and, to my understanding, it's

12   been verified -- that she's presently employed as a cashier

13   in a local restaurant.  Evidently she was hired after the

14   presentence report was written in November of 2021, so

15   presently she is working.

16        Finances.  They, of course, do not include her

17   husband's income.  She has certain federal benefits.

18        Expenses that are listed in the presentence report

19   are the total household expenses.  There was a minimal cash

20   flow.  There's been some accounts in collection status, one

21   charged off, so I find there's no financial ability to pay a

22   fine.

23        She does have the $500 restitution she's agreed

24   to, and, according to counsel, she's paid it.

25        On a personal basis, she was born into an intact

1    union.  She's the only child of her parents.  Her father was

2    disabled.  Accordingly, her mother's disabled with a double-

3    knee replacement, which occurred in 2014, and she had an

4    average childhood.  There are many other experiences in her

5    childhood and teenage years that aren't included in the

6    presentence report.

7                In 2003 she married the co-defendant, Christopher

8    Raphael Spencer.  He works at U.S. Loans Corporation.  He

9    did have some surgery this summer.

10               Ms. Spencer, her husband, and children live in a

11   rental home in North Carolina.  Other information of the

12   children and the husband were omitted from the report, again

13   at the request of defendant's counsel.

14               I do have letters in support.  Friends and family

15   describe her as a devoted mother to her children, and her

16   daughter did write a letter as well as her daughter's

17   boyfriend that describe her as a loving caregiver for her

18   husband's grandmother, her own parents.  She's generous with

19   her time and others in the community.  So she was given

20   certain letters in support that indicates somebody who has

21   been caring and generous.

22               In terms of the statement of offense, I'm going to

23   read what she had agreed to.  It's just easier than trying

24   to summarize what the information is.  To give context, I'm

25   going to go through the background of it otherwise it

1       frankly doesn't make any sense so I will go back to the

2       attack and what was involved without -- before getting to

3       what remains to her specifically, but she did agree to it.

4              The U.S. Capitol, which is in Washington, D.C., is

5       secured 24 hours a day by U.S. Capitol Police.  Restrictions

6       around the Capitol include permanent and temporary security

7       barriers and posts.  Only authorized people with appropriate

8       identification are actually allowed access inside the U.S.

9       Capitol.

10             On January 6th of 2021, the exterior plaza of the

11      U.S. Capitol was closed to members of the public.  There was

12      a joint session of the United States Congress convened at

13      the Capitol.  During the joint session elected members of

14      the U.S. House of Representatives and the U.S. Senate were

15      meeting in separate chambers of the U.S. Capitol to certify

16      the vote count of the Electoral College of the 2020

17      Presidential Election, which had taken place on November 3,

18      2020.  The joint session began at approximately 1:00 p.m.

19      Shortly thereafter, by approximately 1:30 p.m., the House

20      and Senate adjourned to separate chambers to resolve a

21      particular objection.  Vice President Mike Pence was present

22      and presiding first in the joint session and then in the

23      Senate chamber.

24             As the proceedings continued in both the House and

25      the Senate, and with Vice President Pence present and

1    presiding over the Senate, a large crowd gathered outside

2    the U.S. Capitol.  As noted, temporary and permanent

3    barricades were in place around the exterior.  Capitol

4    Police were present and attempting to keep the crowd away

5    from the Capitol Building and the proceedings which were

6    going on inside.

7            At approximately 2:00 p.m., certain individuals in

8    the crowd forced their way through, up and over the

9    barricades and over officers of the U.S. Capitol Police,

10   which were not able to deter them, and the crowd advanced to

11   the exterior facade of the building.  The crowd was not

12   lawfully authorized to enter or remain in the building, and

13   prior to entering the building no members of the crowd

14   submitted to security screenings or records checks by the

15   U.S. Capitol Police or other authorized security officials,

16   which would be required of anybody entering the building.

17           At that time the certification proceedings were

18   still underway, and the exterior doors and windows of the

19   U.S. Capitol were locked or otherwise secured.

20           Members of the U.S. Capitol Police attempted to

21   maintain order and keep the crowd from entering the Capitol;

22   however, shortly after 2:00 p.m. individuals in the crowd

23   forced entry into the Capitol, including by breaking windows

24   and assaulting members of law enforcement as others in the

25   crowd encouraged and assisted those particular acts.

1          The riot resulted in substantial damages to the

2     U.S. Capitol requiring expenditures of more than $1.4

3     million for repairs.

4          At approximately 2:20, members of the U.S. House

5     of Representatives and the U.S. Senate, including the

6     President of the Senate, Vice President Pence, were

7     instructed to -- and did -- evacuate the chambers at the

8     request of the Capitol Police.  All proceedings of the U.S.

9     Congress, including the joint session, were effectively

10    suspended until shortly after 8:00 p.m. the same day.

11    Because of the dangerous circumstances caused by the

12    unlawful entry to the U.S. Capitol, including the danger

13    posed by any individuals who had already entered the Capitol

14    without any security screening or records check, the

15    proceedings could not resume until after every unauthorized

16    occupant had left the U.S. Capitol and the building had been

17    confirmed secure.  The proceedings resumed at approximately

18    8:00 p.m. after it had been secured.

19          Vice President Pence remained in the U.S. Capitol

20    from the time he was evacuated from the Senate Chamber until

21    the session resumed.

22          Let me now go to -- specifically to Ms. Spencer.

23          Virginia Marie Spencer -- evidently she's called

24    Jenny -- and her husband, Christopher Raphael Spencer -- who

25    is also a co-defendant -- walked to the U.S. Capitol after

1    having gone to the rally of Former President Trump passing

2    the bike rack fences which are set up around the perimeter.

3    Jenny Spencer and her co-defendant spent time in the crowd

4    by the inauguration stage on the west side of the U.S.

5    Capitol Building observing members of the crowd attacking

6    law enforcement repeatedly as they tried to keep the crowd

7    away from the building.

8         Jenny and her co-defendant then went up the north

9    set of stairs underneath the scaffolding to the Northwest

10   Terrace near the Senate Wing of the building.  Jenny Spencer

11   and her co-defendant entered a door which had been broken

12   open not long before with windows that were broken out on

13   either side.  Those can be seen in films.

14        Jenny Spencer and her co-defendant then went into

15   the Crypt where other members again attacked a line of

16   officers trying to hold back the crowd.  Jenny Spencer and

17   her co-defendant then went through the Crypt and up the

18   stairs to the second floor.  There Jenny Spencer and her co-

19   defendant went briefly into a hallway of offices belonging

20   to Speaker Pelosi before crossing through Statuary Hall.

21   Jenny Spencer and her co-defendant joined another crowd in

22   Statuary Hall connector outside the House of

23   Representatives.

24        After a time they went down the hall towards the

25   East Side of the building where they ultimately exited onto

1    the portico outside the House of Representatives on the East

2    Side.

3          On January 19, 2021, the FBI interviewed Jenny

4    Spencer during which she admitted to unlawfully entering and

5    proceeding through the U.S. Capitol on January 6, 2021.  She

6    knew at the time she entered the Capitol Building that she

7    was willfully unauthorized knowingly parading,

8    demonstrating, and picketing in a U.S. Capitol Building.

9          So in terms of the sentence, the films certainly

10   corroborate Ms. Spencer's participation in the insurrection

11   at the Capitol.  On leaving the rally before Former

12   President Donald Trump she headed with others to the

13   Capitol.  Her co-defendant and her 14-year-old son went with

14   her.  This was not planned in advance, and I would credit

15   that.

16         On the way, she evidently involved herself in a

17   verbal altercation with a lone counter-protester protesting

18   the Trump supporters.  In the group that she was in, they

19   went beyond a verbal altercation with this protester.  MPD

20   intervened.  She did not get involved in any kind of

21   physical confrontation with this individual.

22         As she approached the Capitol from outside, she

23   could see law enforcement shooting tear gas at the mob in an

24   effort to prevent them from entering the Capitol.

25   Barricades were up.  "Do Not Enter" signs were up.  The mob

1    clearly was overwhelming law enforcement trying to hold them

2    back.

3           The insurrectionists used bear spray, flagpoles,

4    fire extinguishers, and frankly the shear number of people

5    to attack law enforcement officers.  You could see the

6    insurrectionists climbing outside the Capitol Building and

7    onto the scaffolding.  This was not a peaceful gathering to

8    protest or to have their voices heard, as Ms. Spencer

9    described it in the plea.

10          The Capitol Building and the Senate Wing door was

11   breached by the insurrection at 2:13.  The door was damaged.

12   Windows broken next to the door.  There have been on

13   countless films that show that.  She was not involved in

14   breaking down the door, but she did enter with her

15   co-defendant husband and 14-year-old son at approximately

16   2:19.  They breached the door at 2:13, and she's in there at

17   2:19, so that's approximately five to six minutes after the

18   door was breached.  So she would have been in the front

19   although not in the immediate front, but in the grouping of

20   the mob more in the front than the back.

21          She joined the insurrection upon entering as the

22   mobsters passed the law enforcement trying to hold off the

23   mob from coming in.  The defendant was then in the Crypt,

24   joined a mob there along the corridor entering the suite of

25   officers of Speaker Pelosi.  She did no damage, unlike

 1    others.

 2            She then joined another mob outside the House of

 3    Representatives' chambers where law makers were still

 4    trapped inside as we've seen, as I said, in all of these

 5    films.

 6            She witnessed the mobs of insurrectionists

 7    assaulting law enforcement officers.  There were

 8    approximately 140 officers, 150, injured that day.

 9            Ironically she told one of the law enforcement

10    officers that this insurrection was for them as well

11    while they were being beaten up.  Their progress -- this is

12    Ms. Spencer and her husband and child -- through the Capitol

13    was filmed by her husband, and so, you know, what we have is

14    what he has and certainly other films as well.

15            She and her co-defendant husband and her son spent

16    approximately 30 minutes in the Capitol based on the time

17    that she would have left.

18            She did meet with the FBI.  She voluntarily

19    surrendered, and she did meet with them voluntarily;

20    however, she indicated initially that she and her co-

21    defendant husband had no photos, which clearly was not true.

22    She did eventually produce some.  Her husband was filming

23    the events.  He was with her.  She would certainly have

24    known that.

25            Initially it indicates that once in the Capitol,

1    where she was, she realized that they needed to immediately

2    leave.  Certainly she spent over 30 minutes in the building.

3    It wasn't as if the whole building was completely full and

4    you couldn't move.  You obviously could move, and she moved

5    to different groups, the three different groups throughout

6    the building when she was in there.  So her actions belie

7    that statement.  Like I said, she spent an hour in various

8    parts of the Capitol:  downstairs, the Crypt, upstairs.  As

9    you can see she certainly could have asked the Capitol

10   Police in terms of -- at one point they were standing on the

11   side there waiting to try and get through -- how to get out.

12   But there were certainly exits that were visible that, you

13   know, would have been in -- she would have been in a

14   position to get out of it.

15          I also find it very hard to comprehend,

16   Ms. Spencer, why you would bring a 14-year-old minor son to

17   the Capitol, put him needlessly as risk, tear gas, bear

18   spray, people attacking law enforcement, using weapons at

19   hand.  You could see that before you even went in.  I mean,

20   law enforcement had weapons.  Some of the protesters had

21   weapons.  He easily could have been physically injured being

22   there.  This must have been a traumatic experience, to

23   witness this kind of violence.  I'm assuming that that's not

24   what he usually sees.

25          You know, someone else brought their child but

1    they left them in the Mall.  They did not bring them into

2    the Capitol to see this.  This isn't like a school or a

3    tourist trip to visit the Capitol.  It's a complete lack of

4    judgment on your part in terms of -- I'm not going to get

5    into whatever your reasoning was as to what the purpose of

6    this was, but I don't understand that.  And I sincerely hope

7    that he's all right and that this is not going to leave him

8    with a lasting mark; and also how he would figure this out

9    as to what the significance of this was.

10           Ms. Spencer has two convictions.  She has spent a

11   total of 21 days in jail for these two offenses so this

12   would not be the first time that she has had to spend some

13   time locked up.

14           I credit her with pleading guilty.  I think she

15   has shown remorse today.

16           My question, which I still have, is whether she's

17   accepted responsibility as to the significance of what she

18   participated in; an insurrection -- it's not just a protest,

19   and it wasn't peaceful -- with the goal to stop the

20   certification of a presidential election and the peaceful

21   transfer of power as guaranteed by the Constitution.  You

22   know, she clearly regrets and apologized for -- and I accept

23   all of that -- the consequences to her and her family.

24   That's not the same thing as recognizing the significance of

25   her participation, what this means for our democracy and the

1    big picture.

2          The only other time that the Capitol has been

3    invaded was in 1814 when the British invaded the District of

4    Columbia and the Capitol.  I mean, we've had -- our country

5    since the very beginning has had difficult times.  We've had

6    divisions at difficult times in our country.  There have

7    been racial issues that have resulted in violence.  We've

8    had unpopular wars that have involved violence and protests,

9    economic woes from time to time, but there's always been a

10   peaceful transfer of power after an election.  This is the

11   first time that that has been challenged.

12         I certainly -- she was not involved in any

13   preplanning.  I think she went to the rally and decided to

14   join it, but she had certainly opportunities as she walked

15   to and down the Mall, looking at what was happening at the

16   Capitol, to see that it wasn't a great idea to go in.  And

17   what was the purpose of going in?

18         I credit her for not destroying property.  She

19   didn't get into any fights with law enforcement.  She did

20   not, you know, damage anything or hurt anybody physically;

21   but I want to point out that being present, specifically in

22   a mob that was fighting with law enforcement, that her very

23   presence helped create the momentum for the violence that

24   took place, and having a large number of people, which

25   included her and her 14-year-old son, participate in this

1    insurrection provided safety for the violent actions and the

2    violent acts of others and encouraged them by being there.

3    Whether you opened your mouth and said anything, your

4    presence validated what they were doing.

5            Violence is an unacceptable way to resolve

6    political differences.  There are lawful means available in

7    a democracy to change or challenge actions that you disagree

8    with, and you're entitled to disagree with them.  But they

9    don't include a violent insurrection.

10           Your presence and action by joining other

11   insurrectionists was an inexcusable attack on our democracy

12   and the peaceful transfer of power, according to the

13   Constitution, and a total disrespect for the rule of law

14   which governs civilized societies.  And I would hope that we

15   are living in a civilized society.

16           You should appreciate what an extraordinary

17   country you live in with a vibrant democracy.  I mean, if

18   you look at other countries and what they have, we have

19   something so unique.  The idea that someone would think that

20   it was appropriate to damage it or to undercut it -- and I

21   certainly hope you teach your son and your other children

22   how lucky they are to live in a democracy as opposed to some

23   other country ruled by an authoritarian.  Look around.

24   There are certainly enough other countries who have

25   authoritarians, and we don't.

1            In terms of parity, I'm looking at parity in terms

2    of the January 6th cases.  When you look at parity in a

3    globe or in a larger picture, certainly the sentences that

4    are available and the sentences that have been provided

5    would not be -- would be by far more lenient than a lot of

6    other misdemeanors or other sentences for other kinds of

7    crimes, but I have decided -- and I think most of the judges

8    have decided -- to look at it strictly in the context of the

9    January 6th cases.

10           If you look at it beyond that, I think there

11   isn't any parity, but within the January 6th cases there is

12   a chart the government provided, and I have one and the

13   Courts -- judges have been using them as well in terms of

14   tracking the cases.  We're obviously interested in making

15   sure of that in our own sentences, in terms of across the

16   board, because there's no advisory sentencing guidelines

17   that we're being fair and reasonable in these sentences, and

18   looking at the recommendations of the parties and also

19   certainly the factors specific to this case, the defendant,

20   and the sentence in order not to sentence as an outlier

21   without just reason.  And I would agree, it's already

22   happened.

23           Your participation in this crime has consequences

24   for you and your family, and that's unfortunate.  I

25   particularly feel for your family since they have done

1        nothing, but unfortunately when people get involved in

2        criminal acts there are others that are unintended, and they

3        are affected by it, and I'm sorry for the rest of your

4        family because of that.

5             It is my hope that my sentence sends a message

6        to you, to deter you.  In a large sense in terms of

7        thinking through, it's not just what's happened to you, you

8        know, whether you're being ostracized by media or other

9        kinds of issues, and your family has, but also to think

10       about what the significance was and what you actually did,

11       and it has -- the sentence has to send a message, not only

12       to you in terms of deterrence, which is an appropriate one,

13       as well as to others from ever engaging in this type of

14       destructive behavior in the future, but also to recognize

15       that you live in a country where you have all the freedoms

16       which are protected by the rule of law.  You eliminate the

17       rule of law, and you jeopardize those freedoms.

18             So pursuant to the Sentencing Reform Act of 1984

19       and in consideration of the provisions of 18 USC 3553, which

20       would include your deterrence, just punishment, issues

21       relating to rehabilitation in terms of the drug treatment,

22       which is important, and a reasonable sentence, it is the

23       judgment of the Court, that you, Virginia Marie Spencer, are

24       hereby committed to the custody of the Bureau of Prisons for

25       a term of 90 days on Count 5.  You're further sentenced to

1    serve 36 months of probation on Count 5.  In addition, you

2    are ordered to pay a special assessment of $10 in accordance

3    with 18 USC Section 3014.

4           I'm authorizing supervision and jurisdiction to be

5    transferred to the U.S. District Court for the Middle

6    District of North Carolina, since that's where you live, and

7    probation will take care of it there.  They have to accept

8    it at that end.

9           While on supervision, you'll abide by the

10   following mandatory conditions as well as standard

11   conditions of supervision, which are imposed to establish

12   the basic expectations for your conduct while on

13   supervision.  The mandatory conditions include:

14          You must not commit another federal, state, or

15   local crime; not unlawfully possess a controlled substance;

16   must refrain from unlawful use of a controlled substance;

17   submit to drug tests within 15 days and at least two

18   periodic tests thereafter.  Also, depending on the test

19   results, you may be sent to treatment and additional

20   testing.  And you need to make restitution, which is the

21   $500, which I understand you have already paid.

22          You'll comply with the following special

23   conditions:

24          Substance abuse treatment.  You must participate

25   in an inpatient and/or outpatient substance abuse treatment

1    program and follow the rules and regulations of that

2    program.  The probation officer will supervise your

3    participation in the program.

4           Substance abuse testing.  You must submit to

5    substance abuse testing to determine if you have used a

6    prohibited substance, and you must not attempt to obstruct

7    or tamper with the testing methods.

8           I'm not going to put any financial information

9    disclosures or restrictions because you have paid the $500.

10   I do find that you don't have the ability to pay a fine and

11   therefore waive imposition of a fine in this case.

12          So I'll indicate that you're ordered to make

13   restitution in the amount of $500 but will indicate that you

14   have gone ahead and paid that.  So I will leave out at this

15   point, assuming that this is accurate, the terms of where

16   you would pay the restitution and where the restitutions go,

17   the Architect of the Capitol.

18          The probation office shall release the presentence

19   investigation report to all appropriate agencies, which

20   includes the U.S. Probation Office in the approved district

21   of residence, in order to execute the sentence of the Court.

22   Treatment agencies shall return the presentence report to

23   the probation office upon the defendant's completion or

24   termination from treatment.

25          One thing that I am going to amend here.  I --

1    when I looked at this in terms of the transfer, I was

2    transferring -- I meant to only transfer not the whole

3    jurisdiction of the case, which requires my signing off and

4    the judge on the other side, so I'm not doing that at this

5    point.  I am transferring the case to North Carolina for

6    probation in terms of the monitoring, but I'm not

7    transferring my supervision, at least not at this point.  So

8    I'll make that amendment.  I'm authorizing that the

9    supervision be transferred to the Middle District of North

10   Carolina, but not the case itself.

11          Pursuant to 18 USC Section 3742, you have a right

12   to appeal the sentence imposed by the Court if the period of

13   imprisonment is longer than the statutory maximum or the

14   sentence departs upward.  There are other potential reasons

15   why you can as well.  Rather, excuse me, the departure

16   respect does not apply, but if it's longer than the

17   statutory maximum.  It's not, but there are some other areas

18   where you potentially can appeal.  If you choose to appeal,

19   you have to file it within 14 days after the Court enters

20   judgment, and you should talk to Mr. Orenberg about that.

21          Now, as defined in 18 USC 2255, you have a right

22   to challenge the conviction entered or sentence imposed if

23   new and currently unavailable information becomes available

24   or if you received ineffective assistance of counsel in

25   entering the plea of guilty or conviction in connection with

1    your sentencing.  If you're unable to afford the cost of an

2    appeal, you may request permission to file without cost, and

3    you can also request counsel be appointed for you as well.

4          I am going to have her voluntarily surrender, and

5    I am going to put off the time that she needs to surrender

6    so that she can get her affairs in order so this can be

7    worked out.  So she is not to be -- she does not have to

8    voluntarily surrender any earlier than February 25th.

9          So that should give you plenty of time to make

10   whatever arrangements you need to do in terms of your, you

11   know, children and whatever else needs to be done.

12         There's the *Hunter* case that came down back in

13   2016 which requires the Court, appropriately, to inquire as

14   to whether there's anything else; any objections that have

15   not been noted, anything else that needs to be discussed.

16         The one question that I have is whether I will put

17   in that -- recommend that she get drug treatment.  I don't

18   know what they're doing, frankly, with the programs now at

19   BOP.  Because of COVID, I'm not sure that they're actually

20   doing the internal programs, but they do still have some.  I

21   will make that recommendation.

22         If there is a recommendation of where you want her

23   to go, let me know what it is.  I will definitely go ahead

24   and recommend it.

25         Is there anything else from the government?

1         MR. COLLYER:  No, Your Honor.  We would just move

2    to dismiss Counts 2 through 4 of the indictment as to

3    Virginia Marie Spencer only.

4         THE COURT:  Is it 2 to 4?  Is it 1?

5         MR. COLLYER:  This particular defendant is not

6    named in Count 1.

7         THE COURT:  Okay.  All right, so it's 2 through 4.

8    Those counts will then be dismissed.

9         But is there anything from probation?  I will say

10   to you that part of the little problem here is we have a

11   mix-up in terms of formats for doing this, and I didn't have

12   a chance -- it's been difficult to do teleworking and being

13   back and forth and getting all of these things done in a

14   reasonable way, which is why I had a couple of things that

15   I've taken out and made sure that are not part of it.  When

16   it's written up, it will have what I have said with the

17   amendment, which is not switching -- the switching of the

18   supervision.  So she'll be supervised in North Carolina, and

19   I'm taking out all of the restitution issues since she

20   appears to have done that.

21        Mr. Orenberg, do you have a particular place you

22   want to recommend, or do you want to let me know later?

23        MR. ORENBERG:  Can I notify chambers later, Your

24   Honor?  Within a week?

25        THE COURT:  That's fine.

1          You should do something earlier.  It should go in

2     with the judgment.  You can do it later, but they may not

3     catch up with each other even though she's not surrendering

4     until February.  It's better to have -- to start the work on

5     the designation, and it's better to do that beforehand.

6          I would also suggest, Mr. Orenberg, that there is

7     an office with BOP that makes the decision about where she

8     should go.  If you have files and material treatment that

9     you think they should be aware of in making a decision about

10    programs for her, you should provide that to them.  They'll

11    get the presentence report, but they -- if there's other

12    materials in terms of her drug treatment or anything else

13    that she needs that you think they should have, you should

14    go ahead and do that.

15         But if you could call and let my deputy courtroom

16    clerk know where you want her to go, it will go in.  I don't

17    always have people in chambers with the mix of teleworking.

18         MR. ORENBERG:  Very well.  I'll do it by early

19    next week.

20         THE COURT:  So it's easier because she will pick

21    up no matter where she is.

22         Okay.  Anything else, Mr. Orenberg?

23         MR. ORENBERG:  No, thank you, Your Honor.

24         MR. COLLYER:  Your Honor, if I could just -- just

25    to make sure the record is clear, if I could ask the Court,

1    the dismissal as to Counts 2 through 4 is to Virginia Marie

2    Spencer only, correct?

3                    THE COURT:  Right.  Yes.

4                    MR. COLLYER:  Thank you, Your Honor.

5                    THE COURT:  So it should be strictly as to her,

6    not to her husband.

7                    All right.  If there's nothing else, then let me

8    excuse you at this time.

9                    And I hope in terms of the son, someone should

10   have some discussion with him to see whether this has left

11   some trauma for him, and he may need counseling.  But that's

12   not my decision.  I would never order it, but I am

13   concerned.  That's a vulnerable age.

14                   All right.  The parties are excused.  Take care.

15                       (Whereupon the hearing was

16                        concluded at 12:48 p.m.)

17

18

19

20

21

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8        **NOTE:**  This hearing was held remotely by Zoom or some

9     other virtual platform and is subject to the technological

10    limitations of court reporting remotely.

11              Dated this 11th day of January, 2022.

12

13
                         <u>/s/Lisa A. Moreira, RDR, CRR</u>
14                       Official Court Reporter
                         United States Courthouse
15                       Room 6718
                         333 Constitution Avenue, NW
16                       Washington, DC 20001

17

18

19

20

21

22

23

24

25